# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

RANDALL ROBERTSON,

           Plaintiff,

v.                           CIVIL ACTION NO. 3:10-1092

NATIONAL ASBESTOS WORKERS
PENSION FUND,

           Defendant.

## MEMORANDUM OPINION AND ORDER

Pending is the defendant's motion to dismiss and for summary judgment. [Doc. 9] For the following reasons, the Court **GRANTS** the defendant's motion to dismiss and **GRANTS** the defendant's motion for summary judgment. The Court **ORDERS** that the case be **DISMISSED**.

**I.**    **Background and Procedural History**

Plaintiff Randall Robertson ("Plaintiff") filed a breach of contract action in the Circuit Court of Cabell County, West Virginia, alleging that the defendant, National Asbestos Workers Pension Fund (the "Fund"), wrongfully denied his application for continued disability benefits. In the complaint, he seeks damages both for the alleged breach and for unfair claims settlement practices under West Virginia law. *See* West Virginia Unfair Trade Practices Act ("WVUTPA"), W. Va. Code § 33-11-1, *et seq.* The Fund timely removed this action on September 13, 2010. The material facts are as follows.

Plaintiff was an insulation worker, and a member of the Asbestos Workers Local 80 Union. Pl.'s Compl. 4, No. 1-1. He is entitled to participate in a multiemployer disability pension plan of which the Union is a member. Pl.'s Compl. 4, No. 1-1. Because of a long history of neck and back

problems, in April of 1990 Plaintiff filed an application for a disability retirement pension under the Fund's Plan of Benefits (the "Plan"). R. at 1 (6-2). However, in a subsequent letter dated May 25, 1990, Plaintiff wrote to the Fund, indicating that he wished to temporarily stop the application process. R. at 8 (6-2). Thereafter, in July of 1990, he advised the Fund administrators that he wished to reinitiate his application. R. at 11 (6-2).

The Fund initially rendered a favorable decision on Plaintiff's disability pension application in October of 1990, granting benefits retroactively as of August 1, 1990. R. at 21 (6-2). Consequently, Plaintiff began receiving disability retirement checks in the amount of $418.00—an amount that was subsequently raised to $505.00. R. at 21 (6-2); R. at 7 (6-3).[1]

In September of 2001, Plaintiff returned to work as an insulation worker, but apparently did not give the Fund written notice of his change in employment status. R. at 23 (6-3). Because of the Plan's requirement that a retired employee notify the board of trustees of any new employment, the Fund suspended Plaintiff's disability retirement pension benefits on July 10, 2003. App. at 4 (Rockstroh Decl. ¶ 19); R. at 23 (6-3). Thereafter, on July 6, 2004, Plaintiff submitted a new application to the Fund, seeking to reinstate his benefits. App. at 83. The Pension Fund Office made the determination that Plaintiff's monthly benefits would be suspended until his normal retirement date as defined by the Plan, principally due to the fact that Plaintiff had returned to work while receiving disability benefits without notifying the Fund. R. at 13-14 (6-4).

Almost three years later, on February 26, 2007, Plaintiff decided to appeal the Fund's adverse determination. R. at 15 (6-4). He wrote that his ex-wife had, without his knowledge or

---

[1] Plaintiff requested that his benefits be paid each month via electronic direct deposit into a specific bank account. App. at 4 (Rockstroh Decl. ¶ 16).

permission, concealed the fact that he was still receiving benefit checks. R. at 15 (6-4). He further alleged that he mistakenly believed that the checks would have automatically stopped because of the fact that he had returned to work. R. at 15 (6-4). The Pension Fund Executive Committee considered Plaintiff's arguments, and subsequently rejected his appeal. R. at 16-17 (6-4). Plaintiff's counsel continued to correspond with the Fund's representatives, but filed this lawsuit because of the Fund's refusal to reinstate Plaintiff's disability retirement pension benefits. *See, e.g.*, R. at 21 (6-4).

## II.  Discussion

The Fund has filed a motion to dismiss on the ground that Plaintiff's claims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Alternatively, it seeks summary judgment on the question of whether its decision to deny disability retirement benefits to Plaintiff was proper, and on its counterclaim. The Court addresses each motion below.

### A.  Motion to Dismiss

In ruling on a motion to dismiss, the factual allegations in the complaint must be taken in the light most favorable to the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993) ("In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff."). However, the plaintiff must allege more than mere "labels and conclusions," and the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. Plausibility is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

The Fund argues that Plaintiff's state law breach of contract and WVUTPA claims are completely preempted by ERISA. ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a). The phrase "relate to" means having a connection with, or referencing a plan. *See Tingler v. Unum Life Ins. Co. of Am.*, No. 6:02-1285, 2003 U.S. Dist. LEXIS 5455, at *7 (S.D. W. Va. April 2, 2003) (citing *Am. Med. Security, Inc. v. Bartlett*, 111 F.3d 358, 361 (4th Cir. 1997)). ERISA, however, gives qualified pension plan participants the right to bring a civil action to recover benefits under terms of a plan, or to otherwise enforce a right under a plan. *See* 29 U.S.C. § 1132(a)(1)(A)-(B). When a state law claim attempts to enforce rights under a plan, ERISA "converts it into a federal claim." *Summer v. Carelink Health Plans, Inc.*, 461 F. Supp. 2d 482, 486 (S.D. W. Va. 2006); *see also Darcangelo v. Verizon Comm., Inc.*, 292 F.3d 181, 195 (4th Cir. 2002) ("[A]n action to enforce the terms of a contract, when that contract is an ERISA plan, is of necessity an alternative enforcement mechanism for ERISA . . . ."). Thus, even though a state law claim may be completely preempted under ERISA, rather than dismissing it, the proper action should be to "treat it as a federal claim" if it is possible to do so. *Darcangelo*, 292 F.3d at 195.

Here, Plaintiff concedes that this present action is governed by ERISA. His breach of contract claim requests damages under an ERISA plan. This claim is an "alternative means of enforcing . . . rights under ERISA," *Darcangelo*, 292 F.3d at 192, and is completely preempted by federal law. This Court **FINDS** that this count must be recharacterized as an ERISA claim. 29 U.S.C. § 1132(a)(1)(B); *see also Tingler*, 2003 U.S. Dist. LEXIS 5455, at *8-10 (recharacterizing a state breach of contract claim as a federal claim after finding it to be completely preempted

because it was "necessarily an alternate mechanism for ERISA").

However, Plaintiff also asserts claims in Count I for violations of the WVUTPA for illegal processing of his benefits application. W. Va. Code § 33-11-1, *et seq*. "Claims under the WVUTPA that are 'related to' the processing of benefits pursuant to an ERISA plan are preempted . . . ." *Tingler*, 2003 U.S. Dist. LEXIS 5455, at *14; *see also Summer*, 461 F. Supp. 2d at 486 (discussing 29 U.S.C. § 1132(a)(1)(B)). Plaintiff agrees that WVUTPA damages are not available under ERISA, and that the claim should be dismissed. Therefore, insofar as Count I asserts claims for violations of the WVUTPA for illegal processing of benefits, it is **DISMISSED**.

### B. Motion for Summary Judgment on the Benefits Determination

Moving to the recharacterized claim under 29 U.S.C. § 1132(a)(1)(B), the Court must next assess whether the Fund's decision to deny Plaintiff's benefits application was proper under applicable ERISA law. The Fund has requested summary judgment both on the complaint, and on its counterclaim for a retroactive repayment of benefits that Plaintiff received improperly.

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court generally will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Here, the material facts in the administrative record are undisputed, and this matter is appropriate for summary judgment.

### 1. **Standard of Review**

A plan administrator's benefits decisions are generally reviewed *de novo* unless the plan document provides otherwise. *See Gilbert v. Med. Mut. of Ohio Co.*, 666 F. Supp. 2d 625, 632 (S.D. W. Va. 2009). Where a plan provides for discretionary review, an abuse-of-discretion standard instead applies. *Id.*; *see also Frye v. Metro. Life Ins. Co.*, No. 3:10-0107, 2010 U.S. Dist. LEXIS 134565, at *13-15 (S.D. W. Va. Dec. 20, 2010). A plan can confer discretion on its administrator "(1) by language which 'expressly creates discretionary authority,' and (2) by terms which 'create discretion by implication.'" *Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 322 (4th Cir. 2008) (citing *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522-23 (4th Cir. 2000)).

The Fund argues that the Court should apply an abuse-of-discretion standard to the relevant benefits determinations because the Plan expressly provides for discretionary review. Pertinently, the Plan in this case grants the trustees of the Fund the following authority:

> The Trustees, subject to the requirements of the law, are the sole judges of the standard of proof required in any case and the application and interpretation of this Plan, and decisions of the Trustees are final and binding on all parties. The Trustees have the exclusive right and discretionary authority to construe the terms of the Plan, to resolve any ambiguities, and to determine any questions which may arise with the Plan's application or administration, including but not limited to determination of eligibility for benefits. . . .

R. at 1 (6-7). Further, Article VIII, Section 2, of the Pension Fund's Restated Trust Agreement states the following:

> The Trustees shall have full discretion and authority to determine questions of eligibility, requirements for benefits and duration of benefits. They shall have full discretion and authority to adopt rules and regulations setting forth same, which shall be binding on the Employers, Employees, their Beneficiaries and dependents and any other person making claims.

R. at 32 (6-5). The Fund also points out that this discretionary authority is confirmed in Article IX, Section 2 of the Restated Trust Agreement. R. at 34 (6-5) (noting that the trustees' decisions shall

have binding effect).

Here, the Court believes that the applicable Plan provisions and other governing documents entitle the Fund to discretionary review. This is not a case where the plan document merely describes the decision-making function of the administrator. Rather, the Plan in this case expressly confers discretionary authority upon the trustees to interpret its terms, and to resolve the questions that arise from its application. Indeed, as the Fund points out, the Seventh Circuit has previously interpreted this Plan, and concluded that the trustees should be given broad discretion in acting on benefit claims. *See Karr v. Nat'l Asbestos Workers Pension Fund*, 150 F.3d 812, 814 (7th Cir. 1998). Therefore, an abuse-of-discretion standard applies to the relevant benefits determinations.

Under the abuse-of-discretion standard, a "plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"[2] *Conkright v. Frommert*, 130 S. Ct. 1640, 1651 (2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)). Further, "a reviewing court will

---

[2] The Fourth Circuit has identified a list of non-exclusive factors to consider in determining whether an administrator abused its discretion:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000). The Plaintiff does not offer an argument as to any of these factors. It is worth noting that the composition of the Fund does not present a conflict of interest in this case. This is because the Fund is governed by a board of trustees that includes representatives from participating unions and employers. Because the Fund has delegated discretionary authority to the trustees as independent fiduciaries to determine benefit eligibility, the conflict of interest factor is less acute. *See Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 113-14 (2008).

not disturb a decision if it is 'the result of a deliberate and principled reasoning process and is supported by substantial evidence.'" *Gilbert*, 666 F. Supp. 2d at 633 (quoting *Evans v. Metro. Life Ins. Co.*, 358 F.3d 307, 310-11 (4th Cir. 2004)). Thus, when reviewing a claim, it is imperative that the court have before it the facts known to the administrator—and the facts upon which it relied—in making its disability benefit determination. *See Gilbert*, 666 F. Supp. 2d at 633 (noting that the application of the abuse-of-discretion standard depends on a sound factual foundation).

### 2. The Plan and the Relevant Benefits Determination

As discussed, the Plan governs a defined benefit, multi-employer pension fund. *See* 29 U.S.C. §§ 1002(2)(A), (3), (35) and (37)(A). Plaintiff requested a disability retirement pension in accordance with Section 6.3 of the Plan. R. at 30 (6-6). A disability retirement benefit is available for an employee who has completed at least ten years of active service who becomes "Totally and Permanently Disabled" while employed for a participating employer, or within a year after ceasing to be employed. R. at 30 (6-6). An employee is "Totally and Permanently Disabled" only if

> (1) the physical or mental condition is medically determinable and is the result of bodily injury or disease that prevents the Employee from engaging in any occupation or employment for wage or profit except such employment that is found by the Trustees to be for the purpose of rehabilitation and not incompatible with the findings of Total and Permanent Disability, and (2) the Employee submits proof of a Social Security Administration award for Federal disability benefits, or, at the discretion of the Trustees, he submits an opinion of a competent physician, physicians or medical clinic selected and/or approved by the Trustees that the Employee will be Totally and Permanently Disabled through the remainder of his life.

R. at 31-32 (6-6). The Plan further provides that the trustees may terminate benefits if the employee ceases to meet the defined criteria. R. at 32 (6-6). As noted, the Fund granted Plaintiff retroactive benefits as of August 1, 1990, concluding that he qualified for a disability retirement pension under the Plan. Therefore, it sent him monthly benefit checks in accordance with his payment scheme.

However, in September of 2001, Plaintiff returned to work in the insulation industry without giving express written notice to the Fund. R. at 23 (6-3). Under Article IX, Section 9.1(b) of the Plan, a monthly benefit of a "Retired Employee" is not payable if the employee engaged in "Prohibited Employment" before his "Normal Retirement Date" . . . "[u]ntil his Normal Retirement Date if timely written notice of such employment is not given to the Plan."[3] R. at 13 (6-7). Consequently, in July of 2003, the Plan learned of Plaintiff's employment status, and terminated his disability retirement pension benefits under Article IX, Section 9.1(b). R. at 23 (6-3).

Roughly one year later, Plaintiff reinitiated his application for benefits. App. at 83. On August 13, 2004, the Fund notified Plaintiff by letter that, because he had returned to work without providing notice of prohibited employment, his monthly benefit would be suspended until his normal retirement date in accordance with Section 9.1(b). R. at 13-14 (6-4). Plaintiff was further notified of his right to appeal the adverse determination. R. at 14 (6-4). He exercised this right on February 26, 2007, over two years after the Fund's initial decision. R. at 15 (6-4).

In his request for review, Plaintiff advised the Fund that he and his wife had separated in 2003, and that she continued to cash the prior checks without his knowledge. R. at 15 (6-4). He agreed that the funds had to be reimbursed, but nonetheless requested reconsideration of the prior decision to terminate his benefits. R. at 15 (6-4). On May 3, 2007, the Fund denied Plaintiff's appeal on the grounds initially cited in its 2004 denial letter. R. at 17 (6-4). That is, because Plaintiff returned to work while receiving disability retirement pension benefits, and did not notify the Fund when he returned to work, it determined that he was not entitled to further payments until

---

[3] Plaintiff does not seem to contest the fact that he engaged in "Prohibited Employment." Under the Plan, "Prohibited Employment" includes work in the same trade or craft in which the employee was employed during the time covered by the Plan. R. at 13 (6-7).

his "Normal Retirement Date." R. at 17 (6-4).

### 3. The Instant Claim for Benefits

Plaintiff now asks this Court to reverse the Fund's decision because of the substantial evidence of his continued disability. Plaintiff repeats the arguments he made in his appeal. Namely, he claims that his ex-wife handled all of the family finances, including the receipt and administration of his pension benefits. He thus contends that he was not aware of the continued transmission of benefit checks to his prior address, and his ex-wife's fraudulent cashing of those checks. Further, while acknowledging carelessness on his part, he submits that he did not know that he was required to affirmatively notify the Fund of his work status.

#### a. Timeliness of Appeal

The Fund first argues that it was not an abuse of discretion to deny the appeal because Plaintiff's application was untimely. Under the Plan, an employee has 60 days to request review of a determination suspending his benefits. R. at 17 (6-7).[4] While ERISA does not explicitly contain an exhaustion requirement, ERISA benefit plan participants must generally exhaust plan remedies before gaining access to the courts. *See Gayle v. United Parcel Serv., Inc.,* 401 F.3d 222, 226 (4th Cir. 2005). "This exhaustion requirement rests upon the Act's text and structure as well as the strong federal interest encouraging private resolution of ERISA disputes." *Makar v. Health Care Corp.*, 872 F.2d 80, 82 (4th Cir. 1989); *see also Thomas v. Wells Fargo Ins. Servcs. of W. Va., Inc.*, No. 2:07-671, 2010 U.S. Dist. LEXIS 95973, at *34 (S.D. W. Va. Sept. 14, 2010).

---

[4] There seems to be some confusion as to the correct amount of days an employee has under the Plan. The Fund cites to a provision in the summary plan description, noting that the employee has 180 days to appeal. R. at 11 (6-9). The distinction, however, does not change the result reached by the Court.

The Fund is correct that Plaintiff failed to file his request for review within the requisite time period. However, it did not deny his appeal on that ground, and instead addressed the merits of his benefits application. Federal law defines waiver as an "intentional relinquishment and abandonment of a known right or privilege." *Chapman v. Choicecare Long Island Term Disability Plan*, No. 01-7282, 2002 U.S. App. LEXIS 24460, at *9-10 (2d Cir. April 29, 2002) (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)). Because the Fund failed to identify exhaustion as a basis for dismissing Plaintiff's appeal, the Court believes that the Fund has given up the right to assert this defense.

An obvious question related to this analysis is whether the ERISA exhaustion requirement is a jurisdictional or substantive defense. Unlike most affirmative defenses, jurisdictional limitations are not subject to equitable tolling or waiver principles because of Article III's mandate that "federal courts . . . not expand their jurisdiction beyond what has been granted to them by Congress." *See McCoy v. Bd. of Trs. of the Laborer's Int'l Union Local No. 222 Pension Plan*, 188 F. Supp. 2d 461, 467-68 (D. N.J. 2002). The Fourth Circuit has not explicitly addressed the issue at hand, but has suggested that the exhaustion defense may be waived in some instances. *See Cross v. Bragg*, No. 07-1699, 2009 U.S. App. LEXIS 16392, at *17-18 (4th Cir. July 24, 2009) (holding that it was not an abuse of discretion for the district court to find the defendant's argument that the plaintiffs failed to exhaust plan remedies waived under a Rule 60(b) motion for reconsideration). Other circuits, however, have expressly concluded that the ERISA exhaustion defense is not jurisdictional. *See, e.g.*, *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 445-46 (2d Cir. 2006) (recognizing that "a failure to exhaust ERISA administrative remedies under section 502(a)(1)(B) is an affirmative defense"). Despite the strong policy favoring exhaustion of administrative remedies, *see*

*Makar*, 872 F.2d at 82, the Court simply cannot address this defense when the Fund did not at all allude to its factual basis in dismissing the underlying appeal. *Cf. Chapman*, 2002 U.S. App. LEXIS 24460, at *10 (suggesting that, where a plan administrator mentions the factual basis for the exhaustion defense in its ultimate disposition, the defense is preserved).

Therefore, the Court addresses this matter on the merits to determine whether the Fund abused its discretion in refusing to reinitiate Plaintiff's disability retirement pension benefits.

### b. The Merits

As noted, Plaintiff began receiving his disability retirement pension benefits in August of 1990. R. at 21 (6-2). When the Fund originally approved his application, it determined that he was a "Retired Employee" as that term is defined in section 1.28 of the Plan. R. at 21 (6-2). Several years later, after Plaintiff had returned to work as an insulation worker, the Fund—on the initial application and on appeal—determined that he had engaged in "Prohibited Employment" under the Plan, and therefore, because he did not provide "timely written notice" under Section 9.1(b), he was no longer eligible for benefits until his "Normal Retirement Date." R. at 16-17 (6-4).

As Article IX, Section 9.1(b) pertinently provides:

> Except as otherwise provided in Section 9.4, the monthly benefit of a Retired Employee is not payable if an Employee engages in Prohibited Employment before his Normal Retirement Date . . . (b) [u]ntil his Normal Retirement Date if timely written notice of such employment is not given to the Plan[]. . . .

R. at 13 (6-7). The "Normal Retirement Date" is the later of (1) attainment of age 65 or (2) the earlier of completion of two years of Future Service Credit or the fifth anniversary of the date the Employee begins participation in the Plan. R. at 28 (6-6). As it is uncontested that Plaintiff does not qualify under the latter ground for purposes of this action, his normal retirement date occurs when he attains the age of 65.

The Court cannot say, after reviewing the record, that it was an abuse of discretion for the Fund to find in the manner in which it did. Plaintiff failed to notify the Fund that he had become employed in September of 2001. Plaintiff argues that an exception should apply in this case because he believed that the Plan's executive committee should have been aware that he began working again. As he alleges, he did not know that his ex-wife kept his benefit payments that were sent to his old bank account.

Section 9.1 of the Plan, to be sure, seems to permit a rather punitive result in situations like the instant one. However, even if Plaintiff's allegations are true, the Plan's dictate is still the same. An employee's good faith erroneous belief that the Fund has notice of a fact which he has a duty to supplement is simply not sufficient to substitute for the timely written notice required by the Plan. Nor is it sufficient to reverse an otherwise proper decision made on this basis. The applicable summary plan description in this case clearly sets out the foregoing requirements, and extensively details the result that will occur if an employee fails to give proper notice of prohibited employment. R. at 16 (6-9) ("If you work in Prohibited Employment before Normal Retirement Age and you do not notify the Administrative Manager on a timely basis, your benefits will be suspended until your 65th birthday).

Courts must enforce benefits determinations strictly in accordance with the provisions of the applicable plan document. Under the Plan, the Fund has discretion to suspend a pensioner's benefits when he works in Prohibited Employment. Under Section 9.1(b), those benefits remain unpayable until the employee's 65th birthday if he fails to give timely written notice to the Fund that he had started another job. Upon Plaintiff's subsequent request for a new award of disability retirement pension benefits, the Fund determined that this suspension continues to apply, and therefore

correctly denied his renewed benefits application.

On balance, the factors in *Booth* support the Fund's determination. 201 F.3d at 342-43. First, as detailed above, the Fund's decision was consistent with the language of the Plan, and is supported by the undisputed facts in the administrative record provided to this Court on review. *Id.* The provisions permitting suspension under the Plan are cross-referenced in the summary plan description, and explained unambiguously.[5] Under the third, fourth, and fifth factors, the decision appears to have been well-reasoned and factually sound, and consistent with the Fund's earlier interpretations. *Id.*; R. at 31-36 (6-4). Further, as also discussed, there are no facts suggesting a conflict of interest in this case, and the Fund has complied with ERISA's procedural notice requirements both on its denial of the initial application and on appeal. R. at 13-17 (6-4). Finally, under the second *Booth* factor, the Court agrees with the Fund that its decision furthers the goals and policies of the Plan in that it encourages voluntary notification when early retirees return to work, and seeks to vigorously prohibit fraudulent receipt of benefits. 201 F.3d at 342-43.

While the Court certainly sympathizes with Plaintiff's situation and hopes that the Fund would consider his particular circumstances in the future,[6] the facts that he has cited concern external matters not relevant for the narrow question on review. Having established the foregoing,

---

[5] Section 9.1 of the Plan does not define "timely written notice." Section 9.5(b) states that notice of engagement in Prohibited Employment must be given within 30 days of commencing work in covered employment. R. at 16 (6-7). The Fund relies upon this section in making its arguments. However, in this case, Plaintiff did not provide *any* type of notice to the Fund of his new employment, and concedes that he did not comply with the notice requirement for the reasons already discussed. Therefore, the Court need not address the Fund's determination on the definition of "timely written notice."

[6] The Fund, may, after all, waive suspension of benefits based upon an employee's previous good record. R. at 17 (6-7) (Article IX, Section 9.7).

-14-

Plaintiff of course retains his right to seek relief against other culpable parties.

### C. Counterclaim

The Fund also moves for summary judgment on its counterclaim, seeking restitutionary recovery of $11,615 it improperly paid to Plaintiff as a result of his failure to give notification of his return to work in "Prohibited Employment."

The Fund is not a party with standing to enforce plan rights under 29 U.S.C. § 1132(a)(1)(B) because only beneficiaries or participants of a plan may bring an action under this provision. In *Provident Life & Accident Insurance Co. v. Waller*, 906 F.2d 985, 993-994 (4th Cir. 1990), the Fourth Circuit fashioned a federal common law remedy, permitting a plan administrator plaintiff to obtain relief under an unjust enrichment theory for overpayment of plan benefits. *Id.* (deriving its conclusion by analogy to 29 U.S.C. § 1103(c)(2)(A) of ERISA, which evidences a "desire to ensure that plan funds are administered equitably and that no one party, not even plan beneficiaries, should unjustly profit"). Since then, however, *Waller* has been criticized, and limited to situations where a specific plan provision of a policy or contract provides for reimbursement of erroneously paid benefits. *See Life & Acci. Ins. Co. v. Cohen*, 423 F.3d 413, 426 (4th Cir. 2005). As the Court in *Cohen* reasoned, after *Waller* was decided, it had become more clear that the administrator of a plan qualified as a fiduciary under 29 U.S.C. § 1132(a)(3), and therefore had explicit ERISA statutory remedies provided for by Congress.

Under ERISA, a fiduciary may bring an action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). "[A]ppropriate equitable relief" refers only to

"categories of relief that were *typically* available in equity." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (quotation omitted) (emphasis in original). Restitution can be classified as either a legal or equitable remedy—depending on the nature of the plaintiff's request. *Id.* at 213. Equitable restitution was "ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* at 213-14. The Supreme Court in *Knudson* alternatively defines *legal* restitution as follows:

> In cases in which the plaintiff "could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him," the plaintiff had a right to restitution at law through an action derived from the common law writ of assumpsit. . . . In such cases, the plaintiff's claim was considered legal because he sought "to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money." . . . Such claims were viewed essentially as actions at law for breach of contract (whether the contract was actual or implied).

*Id.* (citations and emphasis removed). Some courts, including the Fourth Circuit, have utilized a three-pronged inquiry for determining whether a restitutionary remedy sought by the plan, or plan fiduciary, is *typically equitable*. *See Unum Life Ins. Co. of Am. v. Grouke*, 406 F. Supp. 2d 524, 528-29 (M.D. Pa. 2007) (noting that the inquiry entails an examination into whether the funds sought to be recovered are specifically identifiable, belong in good conscience to the plan, and whether they are in the possession and control of the defendant beneficiary). *Id.* While *legal* restitution could ostensibly provide the Fund with the relief it seeks in this case, *equitable* restitution cannot. Under the undisputed facts, Plaintiff does not have access to the $11,615 that the Fund is requesting. Rather, he contends that his ex-wife used the money without his permission or knowledge.

Therefore, it would seem as a general matter that the Fund may recover only if it can state a claim for unjust enrichment under *Waller*. Article VIII, Section 8.16 of the Plan authorizes

recovery of overpayments. R. at 12 (6-7). It provides:

> In the event that any Pensioner or Beneficiary receives payments from the Plan in excess of that to which he is entitled, the Board of Trustees shall have full discretion and authority to take all actions appropriate to the recovery of overpayments, including but not limited to the retention of future benefits payable from the Plan. In all cases involving overpayments, the Board of Trustees will consider all relevant facts and circumstances in determining an appropriate course of action for the Plan.

R. at 12 (6-7). Plaintiff agrees that any improperly paid benefits should be reimbursed to the Fund. R. at 15 (6-4). As the Plan authorizes recovery for overpayments, this case would appear to fall within the narrow remnants of the *Waller* decision.[7] *See Cohen*, 423 F.3d at 426; *cf. Mason v. M.F. Smith & Assocs.*, 158 F. Supp. 2d 673, 687-88 (D.S.C. 2001) (declining to find a *Waller* claim because the applicable plan at issue did not include any provision which permitted an insurer to "seek repayment of monies mistakenly paid to an insured as disability benefits"). Therefore, the Court applies the unjust enrichment test to the benefits recovery determination in this case. To recover in unjust enrichment, a party must show that "(1) he had a reasonable expectation of payment, (2) the defendant should reasonably have expected to pay, or (3) society's reasonable expectations of person and property would be defeated by nonpayment." *Waller*, 906 F.2d at 993-94 (citing C. Kaufman, *Corbin on Contracts*, § 19A, at 50 (Supp. 1989)).

Here, all three elements are satisfied. First, the Fund had a reasonable expectation of repayment because the Plan provides that the trustees, in their fiduciary capacity, have the right and obligation to recover overpayments. Second, Plaintiff should have reasonably anticipated his obligation to reimburse the Fund for benefits to which he is not entitled. He admits as much in his

---

[7] In determining whether to fashion an unjust enrichment remedy within the federal common law, the court must consider aspects such as the plan contract, ERISA statutory policies, and state law. *See Neal v. GMC*, 266 F. Supp. 2d 449, 454 (W.D.N.C. 2003).

response. Due to the large number of participants covered by the Fund, the Plan documents clearly provide that retired beneficiaries participating in "Prohibited Employment" must give affirmative written notification of their work status. This enables the trustees to comply with their fiduciary obligations to carefully and judiciously manage the Fund's pension program. Because Plaintiff had clear access to the summary plan description detailing these requirements, the Court concludes that he should have reasonably expected to re-pay the benefits at issue. Finally, the interests of society would be served here by an unjust enrichment remedy because denying recovery of overpayments in cases such as this would discourage employers from operating ERISA-qualifying plans. *See Waller*, 906 F.2d at 993.

For these reasons, the Fund is entitled to recover $11,615 in overpayments. The Fund has intimated that it will likely recover these overpayments by way of offset of Plaintiff's future pension benefits in a manner consistent with the Plan's provisions. R. at 29 (6-4). The Court does not expect the Fund to take a different course of action.

### III. Conclusion

For the foregoing reasons, the Court **GRANTS** the defendant's motion to dismiss and **GRANTS** the defendant's motion for summary judgment. [Doc. 9]. The Court **ORDERS** that this case be **DISMISSED**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

        ENTER:       February 14, 2011

        _____
        ROBERT C. CHAMBERS
        UNITED STATES DISTRICT JUDGE